Melissa G. Fulgencio (CBN 277663)
E-mail: mel@upliftlaw.net
UPLIFT LAW, P.C.
650 North Rose Drive, Suite 620
Placentia, California 92870
Telephone: 714.248.5612
Facsimile:  714.582.3990

ATTORNEY FOR PLAINTIFFS
Metroflex Oceanside LLC; etc.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

METROFLEX OCEANSIDE LLC, a
California limited liability company;
BOULEVARD FITNESS LLC, a
California limited liability company;
DEADWEIGHT STRENGTH INC., a
California corporation; CONVOY
STRENGTH, LLC, a California limited
liability company; MJT LLC, a
California limited liability company;
BEING FIT OF MIRA MESA INC., a
California corporation; BEING FIT,
INC., a California corporation; and
RAMONA FITNESS CENTER, LLC, a
California limited liability,

              Plaintiffs,

       v.

GAVIN NEWSOM, in his official
capacity as Governor of California;
XAVIER BECERRA, in his official
capacity as the Attorney General of
California; SANDRA SHREWY, MPH,
MSW in her official capacity as the
Director and State Public Health Officer;
KEVIN FAULCONER, in his official
capacity as Mayor of the City of San
Diego; PETER WEISS, in his official
capacity as Mayor of the City of
Oceanside; SERGE DEDINA, in his
official capacity as Mayor of the City of
Imperial Beach; DONNA FRYE, in her
official capacity as Mayor of the City of
Clairemont; NICK MACCHIONE, in his

Case No. **'20 CV2110 CAB AGS**

COMPLAINT FOR DECLARATORY
RELIEF, INJUNCTIVE RELIEF, AND
DAMAGES

1  official capacity as Director of the
   County of San Diego Health and Human
2  Services Agency; WILMA WOOTEN,
   MD, in her official capacity as San Diego
3  County Public Health Officer; MARA
   W. ELLIOTT, in her official capacity as
4  San Diego City Attorney; WILLIAM D.
   GORE, in his official capacity as San
5  Diego County Sheriff; DAVID NISLEIT,
   in his official capacity as San Diego
6  Chief of Police; SUMMER STEPHAN,
   in her official capacity as San Diego
7  County District Attorney; GREG COX,
   in his official capacity as a San Diego
8  County Supervisor; DIANNE JACOB, in
   her official capacity as a San Diego
9  County Supervisor; KRISTIN GASPAR,
   in her official capacity as an San Diego
10 County Supervisor; NATHAN
   FLETCHER, in his official capacity as a
11 San Diego County Supervisor; JIM
   DESMOND, in his official capacity as a
12 San Diego County Supervisor;  and
   DOES 1 through 100,
13
                Defendants.
14

15

16        Plaintiffs Metroflex Oceanside, LLC, a California limited liability company;

17 Boulevard Fitness LLC, a California limited liability company; Deadweight Strength,

18 Inc., a California corporation; Convoy Strength, LLC, a California limited liability

19 company; Imperial Beach Fitness, LLC, a California limited liability company; Being

20 Fit of Mira Mesa, Inc., a California corporation; Being Fit, Inc., a California

21 corporation; and Ramona Fitness Center, a California limited liability (hereinafter

22 collectively referred to as "Plaintiffs"), by and through their attorneys of record, Uplift

23 Law, P.C., allege claims against the above-named Defendants Gavin Newsom, in his

24 official capacity as Governor of California; Xavier Becerra, in his official capacity as

25 Attorney General of California; Sonia Y. Angel, MD, MPH, in her official capacity as

26 the Director and State Public Health Officer;  Kevin Faulconer, in his official capacity

27 as Mayor of the City of San Diego; Peter Weiss, in his official capacity as Mayor of

28 the City of Oceanside; Serge Dedina, in his official capacity as Mayor of the City of

Imperial Beach; Donna Frye, in her official capacity as Mayor of the City of Clairemont; Nick Macchione, in his official capacity as Director of the County of San Diego Health and Human Services Agency; Wilma Wooten, in her official capacity as San Diego County Public Health Officer; Mara W. Elliott, in her official capacity as San Diego City Attorney; William D. Gore, in his official capacity as San Diego County Sheriff; David Nisleit, in his official capacity as San Diego Chief of Police; Summer Stephan, in her official capacity as San Diego County District Attorney; Greg Cox, in his official capacity as a San Diego County Supervisor; Dianne Jacob, in her official capacity as a San Diego County Supervisor; Kristin Gaspar, in her official capacity as an San Diego County Supervisor; Nathan Fletcher, in his official capacity as a San Diego County Supervisor; Jim Desmond, in his official capacity as a San Diego County Supervisor;  and DOES 1 through 100 (hereinafter collectively referred to as "Defendants") as follows:

NATURE OF THE ACTION

1.     Following the outbreak and subsequent global pandemic regarding the novel coronavirus, the State of California began taking purported emergency measures in an effort to slow the spread of COVID-19 such that the medical infrastructure in place is not overwhelmed.

2.     The sovereign people of the State of California have graciously endured an unprecedented suspension of their civil liberties.

3.     However, all government power in this country, no matter how well-intentioned, derives only from the state and federal constitutions.  Governmental power cannot be exercised in conflict with the constitution, even in a pandemic.   The Constitution is not suspended when the government declares a state of disaster.  See In Re Salon A La Mode, Et Al., No. 20-0340 (Tex. May 5, 2020) (citing In Re Abbott, No. 20-0291, 2020 WL 1943226, at *1 (Tex. Apr. 23, 2020).

4.     As COVID-19 spread, local officials scrambled to implement a myriad of measures purporting to protect Californians. California's Governor issued Executive

Orders to establish state-wide regulations, which were also implemented and enforced on the county and city level.

5.     Plaintiffs have filed this Action in an effort to challenge the constitutionality of Defendants' Orders that severely limit Plaintiffs' civil rights and liberties by ordering the citizens of the State of California "shelter-in-place" and effectively close any businesses Defendants have arbitrarily deemed "Non-Essential."

6.     Defendants' Orders have violated, and continue to violate, Plaintiffs' rights under both the California Constitution, as well as the United States Constitution. As a result of Defendants' unlawful violations of Plaintiffs' civil liberties and rights, Defendants have also caused severe economic damage to Plaintiffs. The economic damages suffered by Plaintiffs is such that Plaintiffs may never financially recover from the harm

7.     Accordingly, Plaintiffs have filed this Action seeking: 1) equitable and injunctive relief to enjoin enforcement of Defendants' Orders; 2) declaratory relief that Defendants' Orders violate Plaintiffs' civil rights under: a) U.S.C. § 1983 of the Federal Civil Rights Act; b) the Due Process Clause of the Fifth Amendments; c) the Due Process Clause of the Fourteenth Amendments; and c) Article 1, Sections 1, 7, and 19 of the California Constitution; 3) attorneys' fees and costs incurred by Plaintiffs' in an amount according to proof; 4) monetary damages; and 5) such other and further relief as this Court deems just and appropriate.

THE PARTIES

Plaintiffs

8.     Plaintiff Metroflex Oceanside LLC is a California limited liability company authorized and doing business in the State of California as Metroflex Oceanside ("Metro").  Metro's principal place of business is located in Oceanside, San Diego County, California.

9.     Plaintiff Boulevard Fitness LLC is a California limited liability company authorized and doing business in the State of California as Boulevard Fitness

("Boulevard"). Boulevard's principal place of business is located in San Diego, San Diego County, California.

10.     Plaintiff Deadweight Strength Inc. is a California corporation authorized and doing business in the State of California as Deadweight Strength ("Deadweight"). Deadweight's principal place of business is located in San Diego, San Diego County, California.

11.     Plaintiff Convoy Strength, LLC is a California limited liability company authorized and doing business in the State of California as Convoy Strength ("Convoy Strength").  Convoy Strength's principal place of business is located in San Diego, San Diego County, California.

12.     Plaintiff MJT, LLC is a California limited liability company authorized and doing business in the State of California as IB Fitness ("MJT").  MJT'S principal place of business is located in Imperial Beach, San Diego County, California.

13.     Plaintiff Being Fit of Mira Mesa, Inc. is a California corporation authorized and doing business in the State of California as Being Fit Fitness Center ("Being Fit"). Being Fit's principal place of business is located in Mira Mesa, San Diego County, California.

14.     Plaintiff Being Fit, Inc. is a California corporation authorized and doing business in the State of California as Being Fit Clairemont ("Being Fit Clairemont"). Being Fit Clairemont's principal place of business is located in Clairemont, San Diego County, California.

15.     Plaintiff Ramona Fitness Center, LLC is a California limited liability company authorized and doing business in the State of California as Ramona Fitness ("Ramona Fitness").  Ramona Fitness' principal place of business is located in Ramona, San Diego County, California.

Defendants

16.     Defendant Governor Gavin Newsom ("Newsom" or "Governor")) is made a party to this Action in his official capacity as the Governor of the State of California.

The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. Art. V, § 1. Governor Newsom signed Executive Order N-33-20 (the "Executive Order") on or about March 17, 2020.

17.     Defendant Xavier Becerra ("Becerra") is made a party to this Action in his official capacity as the Attorney General of California. Under California law, Becerra is the chief law enforcement officer with supervision over all sheriffs in the State of California. Cal. Const. Art. V, § 13.

18.     Defendant Sandra Shrewy, MPH, MSW ("Shrewy") is made a party to this Action in her official capacity as the Director and State Public Health Officer and is sued in her official capacity pursuant to Ex Parte Young to challenge the constitutionality of her office's list of "Essential Critical Infrastructure Workers" which was issued by Shrewy on March 22, 2020 to complement Newsom's Executive Order.

19.     Defendant Kevin Faulconer ("Faulconer") is made a party to this Action in his official capacity as the Mayor of San Diego in the State of California. Faulconer is sued in his official capacity under the rule of Ex Parte Young to enjoin the enforcement of any Order, instituted to shut down all "Non-Essential" businesses.

20.     Defendant Peter Weiss ("Weiss") is made a party to this Action in his official capacity as the Mayor of Oceanside in the State of California. Weiss is sued in his official capacity under the rule of Ex Parte Young to enjoin the enforcement of any Order, instituted to shut down all "Non-Essential" businesses.

21.     Defendant Serge Dedina ("Dedina") is made a party to this Action in his official capacity as the Mayor of Imperial Beach in the State of California. Dedina is sued in his official capacity under the rule of Ex Parte Young to enjoin the enforcement of any Order, instituted to shut down all "Non-Essential" businesses.

22.     Defendant Donna Frye ("Frye") is made a party to this Action in her official capacity as the Mayor of Clairemont in the State of California. Frye is sued in

her official capacity under the rule of Ex Parte Young to enjoin the enforcement of any Order, instituted to shut down all "Non-Essential" businesses.

23.     Defendant Nick Macchione ("Macchione") is made a party to this Action in his official capacity as the Director of the County of San Diego Health and Human Services Agency in the State of California. Macchione is sued in his official capacity under the rule of Ex Parte Young to enjoin the enforcement of any Order, instituted to shut down all "Non-Essential" businesses.

24.     Defendant Wilma Wooten, MD ("Wooten") is made a party to this Action in her official capacity as the San Diego County Public Health Officer. Wooten is sued in her official capacity under the rule of Ex Parte Young to enjoin the enforcement of any Order, instituted to shut down all "Non-Essential" businesses.

25.     Defendant Mara Elliott ("Elliott") is made a party to this Action in her official capacity as the San Diego City Attorney. Elliott is sued in her official capacity under the rule of Ex Parte Young to enjoin the enforcement of any Order, instituted to shut down all "Non-Essential" businesses.

26.     Defendant William D. Gore ("Gore") is made a party to this Action in his official capacity as San Diego County Sheriff. Under California law, Gore has the responsibility to enforce the San Diego County Order in San Diego County. See Cal. Gov't Code § 26601.

27.     Defendant David Nisleit ("Nisleit") is made a party to this Action in his official capacity as San Diego Chief of Police. Under California law, Nisleit has the responsibility to enforce the San Diego County Order in San Diego County. See Cal. Gov't Code § 26601.

28.     Defendant Summer Stephan ("Stephan") is made a party to this Action in her official capacity as the San Diego District Attorney. Under California law, Stephan has the responsibility to enforce the San Diego County Order in San Diego County. See Cal. Gov't Code § 26601.

29.   Defendant Greg Cox is made a party to this Action in his official capacity as a member of the San Diego County Board of Supervisors, which exercises broad legislative, executive, and quasi-judicial authority under California law, including the supervision of the county sheriff and public health officials. See, e.g., Cal. Gov't Code §§ 25000, et seq.; Cal. Health & Safety Code § 101000.

30.   Defendant Dianne Jacob is made a party to this Action in her official capacity as a member of the San Diego County Board of Supervisors, which exercises broad legislative, executive, and quasi-judicial authority under California law, including the supervision of the county sheriff and public health officials. See, e.g., Cal. Gov't Code §§ 25000, et seq.; Cal. Health & Safety Code § 101000.

31.   Defendant Kristin Gaspar is made a party to this Action in her official capacity as a member of the San Diego County Board of Supervisors, which exercises broad legislative, executive, and quasi-judicial authority under California law, including the supervision of the county sheriff and public health officials. See, e.g., Cal. Gov't Code §§ 25000, et seq.; Cal. Health & Safety Code § 101000.

32.   Defendant Nathan Fletcher is made a party to this Action in his official capacity as a member of the San Diego County Board of Supervisors, which exercises broad legislative, executive, and quasi-judicial authority under California law, including the supervision of the county sheriff and public health officials. See, e.g., Cal. Gov't Code §§ 25000, et seq.; Cal. Health & Safety Code § 101000.

33.   Defendant Jim Desmond is made a party to this Action in his official capacity as a member of the San Diego County Board of Supervisors, which exercises broad legislative, executive, and quasi-judicial authority under California law, including the supervision of the county sheriff and public health officials. See, e.g., Cal. Gov't Code §§ 25000, et seq.; Cal. Health & Safety Code § 101000.

34.   The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 100, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and

believe and thereon allege that each of the Defendants designated herein as a DOE is responsible in some manner for the events and happenings herein referred to. As such, Plaintiffs will seek leave of Court to amend this Complaint to insert the true names and capacities of said Defendant as they become identified.

35. As alleged herein, Defendants are responsible for the implementation of various Executive Order(s) and other Civil Orders ("Orders") that are in direct violation of the United States and California Constitutions, including but not limited to, 42 U.S.C. § 1983. Accordingly, each and every Defendant acted under color of state law with respect to all acts or omissions herein alleged.

JURISDICTION AND VENUE

36. The Court has subject matter jurisdiction over the claims asserted in this action based upon Federal Question Jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action involves rights derived from the United States Constitution and because the action seeks to prevent Defendants from interfering with federal rights. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

37. Furthermore, this is, in part, a civil action under 42 U.S.C. § 1983 seeking damages and injunctive relief against Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiffs of rights secured under the Constitution and laws of the United States, as well as for refusing or neglecting to prevent such deprivations and denials to Plaintiffs.

38. Additionally, this action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiffs' Constitutional rights to Due Process and Equal Protection under the Fifth and Fourteenth Amendments to the United States Constitution.

39. Jurisdiction is also appropriate in this Court pursuant to 28 U.S.C. § 1343(a)(3)–(4) to redress the deprivation, under color of any State law, statute,

ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution, and to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

40.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because Plaintiffs' state claims are so related to their federal claims such that they are part of the same case and controversy of those federal claims described herein under Article III of the United States Constitution.

41.     The U.S. District Court for the Southern District of California is the appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the District in which Defendants either maintain offices or do substantial official government work; the District in which Defendants exercise authority in their official capacities; and the District in which Defendants will continue to enforce the Orders and Emergency Directives that are the basis for Plaintiffs' claims; and the District in which substantially all of the events occurred that have given rise to Plaintiffs' claims.

42.     There is a present and actual controversy between and among Plaintiffs and Defendants.

43.     The relief requested is authorized pursuant to 28 U.S.C. §§ 2201 and 2202 (declaratory judgment); 28 U.S.C. § 1651(a) (injunctive relief); 42 U.S.C. § 1988 (right to costs, including attorneys' fees); and Cal. Gov't. Code § 8572 (restitution for state commandeering of private or personal property during state of emergency).

<u>SUBSTANTIVE ALLEGATIONS</u>

I.     THE GOVERNOR'S STAY-AT-HOME ORDER

44.     On March 4, 2020, California Governor Gavin Newsom ("Newsom") declared a state of emergency to exist in California in light of the COVID-19 pandemic. A true and correct copy of Defendant Newsom's Proclamation of a State of Emergency is attached hereto and incorporated herein as Exhibit 1.

45.     On or about March 13, 2020, President Donald J. Trump proclaimed a National State of Emergency as a result of the threat of the emergence of COVID-19.

1  https://www.whitehouse.gov/presidential-actions/proclamation-declaringnational-
2  emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

3  46.    Subsequently, on March 19, 2020, Defendant Newsom signed Executive
4  Order N-33-20 (the "Executive Order"). The Executive Order directed all residents "to
5  immediately heed the current State public health directives," including an order of the
6  state public health officer reprinted in the Executive Order. A true and correct copy of
7  Defendant Newsom's Executive Order N-33-20 is attached hereto and incorporated
8  herein as Exhibit 2.

9  47.    The Executive Order "order[ed] all individuals living in the State of
10 California to stay home or at their place of residence except as needed to maintain
11 continuity of operations of the federal critical infrastructure sector as outlined at
12 https://www.cisa.gov/identifying- critical- infrastructure-during-covid-19."

13 48.    The Executive Order further explained that "[t]he federal government has
14 identified sixteen (16) critical infrastructure sectors whose assets, systems, and
15 networks, whether physical or virtual, are considered so vital to the United States that
16 their incapacitation or destruction would have a debilitating effect on security,
17 economic security, public health or safety, or any combination thereof." Defendant
18 Newsom therefore "order[ed] that Californians working in these 16 critical
19 infrastructure sectors may continue their work because of the importance of these
20 sectors to Californians' health and well-being."

21 49.    The Executive Order explained that it aimed "to establish consistency
22 across the state in order to ensure that we mitigate the impact of COVID-19."

23 50.    This March 19, 2020 Executive Order sought to balance the need to protect
24 Californians from infection against the need to maintain Californians' access to vital
25 supplies and services.  In so doing, Defendant Newsom based the policy on one issue:
26 the federal government's characterization of certain businesses as being a part of the
27 "critical infrastructure" and therefore "essential" to Californians. Thus, those businesses

28

deemed "essential" were and are allowed to continue operating as part of California's coordinated response to COVID-19.

51.     All other businesses, such as Plaintiffs, who did not fall into any of the sixteen (16) "critical infrastructure" sectors, were automatically defined as "Non-Essential" and were forced to immediately cease operations.

52.     The Executive Order was clear that it was <u>not</u> establishing a state-level baseline inviting county innovation above and beyond a minimum; rather, this Executive Order intended that only certain essential businesses shall be permitted to remain open statewide to provide essential goods and services to all Californians.

53.     The Public Health Officers ("PHO") for each county were, in part, tasked with implementing these overreaching orders.  It became clear very early on that the PHOs were completely out of their depth.  PHOs had been given a vast amount of power that they were incompetent to wield. Unlike the Governor, PHOs are not elected positions. In fact, PHOs, some of whom are tasked with the public health of millions, do not require a degree in science or medicine.

54.     Defendants Macchione and Wooten issued similar "shelter-in-place," "stay at home," and "shut down" orders (the "County Orders") for all "Non-Essential" businesses on or about March 17, 2020 for the County of San Diego.  True and correct copies of these County Orders are attached hereto as Exhibit 3.

55.     Since the passage of the County Orders, Defendants Gore and Nisleit have sought to vigorously enforce them against Plaintiffs and other "Non-Essential" businesses.

56.     Additionally, on or about March 22, 2020, Defendant Shrewy issued a comprehensive directive setting forth the types of "Essential Critical Infrastructure Workers" that were to "help state, local, tribal and industry partners as they work to protect communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security."

57.     Altogether, Defendants' Orders have caused widespread and catastrophic damage to the California economy through the government-mandated closure of Plaintiffs' businesses.

58.     As a result of Defendants' Orders mandating closure, Plaintiffs have had difficulty in satisfying their financial obligations, having been forced to lay off a significant number of employees.

59.     Plaintiffs have further expended large sums of money in an effort to comply with Defendants' vague Orders.

60.     On numerous occasions, Plaintiffs have sought clarification regarding Defendants' Orders and apparently arbitrary or selective enforcement thereof, to no avail.

61.     The county level orders that were promulgated in response to the Governor's Order were haphazard, at best, leaving California with a patchwork of entirely different laws for each county. Counties were unable to agree even upon the simplest issues, such as indoor and/or outdoor mask wearing, or the use of gloves.

62.     Further, upon information and belief, despite repeated requests by media and the press, the scientific data that Defendants relied upon in promulgating their orders has never been disclosed. As early as March and April 2020, the press began requesting information under California's Public Records Act.  To date, no responses have been provided.

63.     Moreover, Defendants have asserted that violations of their orders carry criminal penalties, threatening jail time and significant fines for businesses and individuals that do not comply.

64.     Defendants' Orders violate the Due Process Clause of the Fourteenth Amendment because they fail to give reasonable notice to persons of ordinary intelligence of what actions are forbidden under the law.  Plaintiffs have been forced to operate between a rock and a hard place, trying to comply with all of the applicable Orders, but unable to discern what the applicable law permits. This is precisely the

dilemma the Due Process Clause's requirement of fair notice seeks to avoid, particularly where, as here, there is no procedure for Plaintiffs even to challenge the Defendants' Orders.

65.    Defendant Newsom then directed the Office of Emergency Services to "take all necessary steps to ensure compliance with this Order" and that the "Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665."

66.    California Government Code Section 8665 states, "Any person who violates any of the provisions of this chapter or who refuses or willfully neglects to obey any lawful order or regulation promulgated or issued as provided in this chapter, shall be guilty of a misdemeanor and, upon conviction thereof, shall be punishable by a fine not to exceed one thousand dollars ($1,000) or by imprisonment not to exceed six months or by both such fine and imprisonment."

II.    THE GOVERNOR'S REOPENING ORDER

67.    On May 4, 2020, Governor Newsom issued Executive Order N-60-20 concerning the second and third stages of California's "four-stage framework . . . to allow Californians to gradually resume various activities" ("The Governor's Reopening Order"). The Governor's Reopening Order directed the State Public Health Officer to "establish criteria and procedures. . . to determine whether and how particular local jurisdictions may implement public health measures that depart from the statewide directives," specifically "measures less restrictive than any public health measures implemented on a statewide basis." A true and correct copy of Defendant Newsom's Executive Order N-60-20 is attached hereto and incorporated by reference as Exhibit 4.

68.    The Governor's Reopening Order also states that it should not be "construed to limit the existing authority of local health officers" to adopt "more restrictive" or "addition[al]" measures" (emphasis added). Under existing law, "[a] county or city may make and enforce within its limits all local, police, sanitary, and

1   other ordinances and regulations <u>not in conflict with general laws</u>." Cal. Const. art. XI,

2   § 7 (emphasis added).

3        69.    And when, as here, the Governor exercises the State's "police power"

4   during a state of emergency, the Governor's "orders and regulations shall have the

5   force and effect of law." Cal. Gov't Code §§ 8567, 8627.  Accordingly, the Governor's

6   Reopening Order only allows counties to act within their "existing authority"—that is,

7   to adopt measures that are consistent with the Governor's orders or that address matters

8   on which the Governor's orders are silent.  It does not, and cannot be read to, allow a

9   county to override the Governor's Order by extending its authority by extending its

10   authority to include criminal penalties and possible imprisonment.

11   IV. PLAINTIFFS' GYM BUSINESSES

12   <u>Metro</u>

13        70.    Plaintiff Metro operates a gym in Oceanside, California, which is in San

14   Diego County.

15        71.    Metro specializes in holistic wellness,  specifically focusing on nutrition,

16   diet, physical therapy, retail, and personal training.

17        72.    Metro addresses its patrons' physical health by offering personalized diet

18   plans, meal preparation services, sports supplements, personal training, and physical

19   therapy services.

20        73.    Additionally, Metro, in taking a holistic approach to wellness, also offers

21   counseling for the general public, emphasizing suicide prevention and catering to

22   combat-injured veterans struggling with Posttraumatic Stress Disorder and

23        74.    On or about March 19, 2020, Defendant Newsom issued Executive Order

24   N-33-20, ordering all "non-essential" businesses, including gyms, to close indefinitely

25   in response to the COVID-19 pandemic.

26        75.    Executive Order N-33-20 stated that this closure was a temporary, two-

27   week closure to alleviate the stress on hospitals and intensive care units ("ICUs") from

28   a major influx of COVID-19 patients.

COMPLAINT

76. Metro complied with Executive Order N-33-20 and remained closed as Defendant Newsom extended the closure through May 1, 2020.

77. On May 1, 2020, Defendant Newsom extended application of Executive Order N-33-20 and the closure of "non-essential" businesses indefinitely.

78. Metro hired virologists to evaluate its facility and took every necessary precaution to protect its patrons and the community, investing thousands of dollars in sanitation equipment, disinfectant protocols, and structural improvements to increase the air flow in the facility.

79. Despite Metro's good faith attempts to exceed those precautions imposed on so-called "essential" businesses, Metro was unable to confirm their ability to operate due to Executive Order N-33-20.

80. Metro temporarily suspended its membership dues and collected no revenue during the time it remained close in accordance with Executive Order N-33-20.

81. Metro, in light of its inability to secure additional financing and lack of revenue, had no choice but to open for business on or about May 8, 2020.

82. In response to Metro's opening, the Oceanside Police Department arrested Mr. Uridel, owner of Metro, for opening the business in alleged violation of Executive Order N-33-20.

83. The Oceanside Police further threatened to arrest everyone who remained in the Metro building.

84. Metro again closed after Mr. Uridel's arrest and reopened on May 13, 2020.

85. Throughout this reopening period, Metro is not aware of any patrons having reported contracting COVID-19 from Metro.

86. On June 12, 2020, the County allowed gyms and fitness centers to reopen again. Mr. Uridel diligently followed all sanitation and cleaning protocols but was forced to once again restructure a month later when the state ordered his business to close with modifications to operate only outdoors.

87.     Metro has invested thousands into creating an outdoor area so its patrons could exercise. Despite fully complying with the orders to modify operations outdoors, the Oceanside Police Department continually came by to alert Metro of its alleged violations.

88.     Metro has restructured its facility numerous times to satisfy the continually changing state and county orders, despite being given little to no guidance on how to operate in compliance.

89.     Metro estimates that it has been damaged in the amount of approximately $16,000 in mandatory restructuring caused by the coronavirus pandemic, including training employees on new COVID-19 procedures, legal consultations, citations, purchases of personal protective equipment, cleaning supplies, and facility upgrades.

90.     Metro further estimates an an additional $16,000 in lost revenue from the mandatory closures as a "Non-Essential" business.

Boulevard

91.     Shawn Gilbert is the owner of Boulevard Fitness, a business operation specializing in whole body wellness for all members by offering services for physical, mental, and nutrition guidance.

92.     Boulevard takes pride in helping its members with their whole body needs, such as weight management, strength building, injury, rehabilitation, and suicide prevention.

93.     Boulevard is located in a 15,000 square foot facility that boasts a two-story open-air plan with large bay doors and roll-up windows open from floor to ceiling, a roof with built-in fans promoting constant air circulation through the facility, a physical therapy
room, and additional outdoor workout area.

94.     Boulevard shuttered its facility for approximately three months in compliance with the first shutdown order, and in the meantime prepared for the potential of reopening, investing thousands of dollars toward cleaning equipment and

supplies, signage, personal protective equipment, and training staff in new policies for safety and cleanliness.

95.　Additionally, during the time in which Boulevard remained close, it suspended payment of membership dues and collected no revenue.

96.　Finally, on June 12, 2020, the San Diego County of Public Health announced

gyms could finally reopen.

97.　At such time, Boulevard diligently followed all state and county sanitation protocols. However, one month later, Defendants again placed limitations on Boulevard's business operations.

98.　In an attempt to comply, Boulevard moved its equipment outdoors, yet Defendants constantly advised Boulevard that it failed to satisfy Defendants' COVID-19 protocols all the while failing to articulate any specific manner in which Boulevard failed to comply.

99.　Boulevard is informed and believes, and based thereon alleges, that neighboring businesses, such as strip clubs and hookah lounges, remained open without similar harassment from Defendants.

100.　Boulevard Fitness estimates that it has been damaged in the amount of approximately $50,000 as a result of training employees on new COVID-19 procedures, legal consultations, citations, purchases of personal protective equipment, cleaning supplies, and facility upgrades.

Deadweight

101.　Deadweight occupies a two thousand (2,000) square foot facility located in a warehouse with rollup doors, situated along a dead-end alley in San Diego's Grantville neighborhood.

102.　During the shutdown, Defendants made daily visits to Deadweight's facilities.

-18-

103.   On a handful of occasions, San Diego County Sheriff's Department and/or San Diego Police blocked the alley entrance to Deadweight, thereby preventing the free flow of traffic to and from Deadweight.

104.   On numerous occasions, Defendants San Diego County Sheriff's Department and/or San Diego Police questioned any persons leaving Deadweight and threatened citations.

105.   The Deadweight facility has three (3) large roll-up doors and four (4) large commercial fans.

106.   Despite the fans and open-air aspect of the Deadweight facility, Deadweight may not operate under Defendants' arbitrary Orders because the facility is technicaly under a roof.

Convoy Strength

107.   Convoy Strength, a powerlifting and strength gym located in San Diego, California opened on or about February 1, 2020, as a relocation and expansion of the original Convoy Strength.

108.   Convoy Strength sanitized its entire facility and updated its floorplan to allow for social distancing. Additionally, new signs and protocols were placed throughout the Convoy Strenght facility.

109.   To prioritize member safety, Convoy Strength hired a dedicated sanitizing crew, suspended guest passes, and implemented a scheduling system for members to stagger their workout times.

110.   Convoy Strength also limited member occupancy to ten percent (10%) to maximize air flow and safety.

111.   When gyms were officially allowed to reopen again on June 12, 2020, Convoy Strength maintained the same strict cleaning protocols to ensure the safety of his members.

112.   Unfortunately, Convoy Strength's operations came to a halt again on July 13, 2020, as the state ordered that gyms may only operate outdoors.

113.   To date, Convoy Strength has suffered damages in the amount of approximately $142,000 for its loss of business revenue and mandatory investments to remain compliant with the state and county orders, including training new employees on the COVID-19 procedures, legal consultations, dedicated cleaning crews, and purchases for protective and cleaning equipment.

MJT

114.   MJT is a large, 13,000 square foot beachside fitness facility that caters to all anyone who want to improve their fitness, regardless of age or body type. In addition to fitness classes, MJT has individualized workout plans, nutritional guides, and childcare.

115.   Following Defendants' Order mandating the closure of "Non-Essential" businesses, MJT closed.

116.   Unable to provide its members with concrete responses regarding reopening, IB Fitness' members began canceling their memberships.

117.   While MJT remained closed, MJT suspended membership fees and collected no dues throughout its closure.

118.   When, pursuant to Defendants' Orders, MJT was allowed to reopen with limitations, MJT took precautions as required by Defendants' Orders.

119.   Despite MJT'S good faith efforts to comply with Defendants' Orders, Defendants, by and through the San Diego County Sheriff's Department or San Diego Police Department, harassed MJT and its patrons, claiming that MJT somehow failed to comply with Defendants' Orders. At no point did Defendants identify or communicate to MJT with specificity how MJT was allegedly in non-compliance with Defendants' Orders.

120.   As a direct and proximate result of Defendants' Orders, MJT has suffered damages  in the amount of approximately $102,000 as a result of hiring extra staff members, training employees in new COVID-19 procedures, legal consultations,

1  citations, movers, security to patrol outdoor gym equipment, cleaning supplies, and

2  other upgrades to MJT'S facility.

3  ///

4  Being Fit

5      121.   Being Fit is a well-respected fitness conglomeration in the Mira Mesa

6  neighborhood of San Diego, California that has offered the community health and

7  fitness options for over twenty-five years, including, among other things, group classes,

8  personal training, outdoor group exercises.

9      122.   Being Fit generated no revenue during  said the shut down and collected

10 no dues from its members, as it was unfair to charge its members for a facility and

11 services they could not use.

12     123.   During the mandatory closure of allegedly "Non-Essential" businesses,

13 Being Fit's revenue dropped from approximately $31,000 per month to $0 per month,

14 all while continuing to incur expenses.

15     124.   As a result of Defendants' Orders, Being Fit has been damaged in the

16 amount of approximately $1,000,000 for hiring and training employees on the new

17 COVID-19 procedures, legal consultations, outdoor equipment, sanitation equipment,

18 personal protective equipment, and professional cleaning services.

19 Being Fit Clairemont.

20     125.   Being Fit Clairemont is a fitness facility located in Clairemont, California

21 in San Diego County that offers a multitude of programs aimed at improving

22 cardiovascular health, such as circuit training, Zumba classes, and High Intensity

23 Interval Training (HIIT) classes.

24     126.   During the approximately shutdown, Being Fit Claremont invested heavily

25 into developing COVID-19 safety protocol, as well as the procurement of personal

26 protection equipment for employees.

27     127.   As a result of Defendants' Orders both closing "Non-Essential" businesses

28 and limiting the operations of "Non-Essential" businesses, Being Fit Claremont has

been damaged in the amount of approximately $98,000, consisting of added costs of employee training on COVID-19 procedures; legal consultations; cleaning supplies, and lost revenue.

Ramona Fitness

128. Following Defendant Newsom's Order, Ramona Fitness closed for approximately eighty-five (85) days, during which time it lost approximately $250,000.

129. Plaintiff Ramona Fitness is informed and believes, and based thereon alleges, that the San Diego District Attorney's Office and/or San Diego County Sheriff's Department further targeted Ramona Fitness as the first business to be charged with five (5) misdemeanors for allegedly remaining open as a "non-essential" business. Such allegations have cost Ramona Fitness not only monetarily in requiring Ramona Fitness to defend against such claims, but also as negatively affecting Ramona Fitness' reputation in the community.

130. Ramona Fitness was also considered one of Southern California's top senior, silver sneaker facilities, meaning insurance companies previously paid Ramona Fitness to host daily senior fitness classes.

## FIRST CLAIM FOR RELIEF

VIOLATION OF THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT

(By Plaintiffs against All Defendants)

131. Plaintiffs incorporate by reference and re-allege each and every allegation set forth in all preceding paragraphs as if fully set forth herein.

132. The United States Supreme Court has long held that "the Fifth Amendment…was designed to bar Government from forcing people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960).

133. Defendants' Orders and Emergency Directives mandated that because Plaintiffs were "Non-Essential" businesses, they were required to shutter and cease all operations as a means to slow the spread of the novel COVID-19. Such a mandate

completely and unconstitutionally deprived Plaintiffs of all economically beneficial use of their businesses without just compensation.

134.   Although a sovereign government has an inherent "police power" that is reserved for the States by the Tenth Amendment to the United States Constitution, such "police power" is not without Constitutional limits. See Euclid v. Ambler Realty Co., 272 U.S. 365 (1926).

135.   The government's "police power" is restricted by Constitutional considerations, including but not limited to the Fifth Amendments "Takings Clause."

136.   Defendants' Orders, combined with Defendants' enforcement thereof, has caused a total or partial regulatory taking of Plaintiffs' property without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution. At a minimum, the effect of Defendants' Orders constitute a "partial" taking under the Penn Central three-factor test. See Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978). As a result, Defendants' violation of the Takings Clause of the Fifth Amendment has proximately and legally harmed Plaintiffs.

137.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their Constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders and Emergency Directives, namely, the financial harm Plaintiffs have suffered and continue to suffer as a result of Defendants' unlawful Orders and Emergency Directives is such that Plaintiffs may be forced to permanently close.

138.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief, as well as temporary, preliminary, and permanent injunctive relief invalidating the Orders and Emergency Directives and restraining enforcement thereof.

139.   Accordingly, Plaintiffs have found it necessary to engage the services of private council to vindicate their rights under law and therefore are entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

///

1   ///

2                   SECOND CLAIM FOR RELIEF

3   VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH

4                           AMENDMENT

5               (By Plaintiffs against All Defendants)

6       140.   Plaintiffs incorporate by reference and re-allege each and every allegation

7   set forth in all preceding paragraphs as if fully set forth herein.

8       141.   The Due Process Clause of the Fourteenth Amendment provides that "[n]o

9   State shall . . . deprive any person of life, liberty, or property, without due process of

10  law." The fundamental liberties protected by the Due Process Clause include most of

11  the rights enumerated in the Bill of Rights. See Duncan v. Louisiana, 391 U.S. 145,

12  147-149 (1968).

13      142.   The liberties afforded by the Due Process Clause of the Fourteenth

14  Amendment further extend to one's personal choices central to individual dignity and

15  autonomy, including intimate choices that relate to personal beliefs. See, e.g., Eisenstadt

16  v. Baird, 405 U.S. 438, 453 (1972).

17      143.   A State "violates this guarantee by taking away someone's life, liberty, or

18  property under a criminal law so vague that it fails to give ordinary people fair notice

19  of the conduct it punishes, or so standardless that it invites arbitrary enforcement."

20  Johnson v. United States, 135 S. Ct. 2551, 2556 (2015).

21      144.   Plaintiffs have a fundamental property interest in conducting lawful

22  business activities that are protected by the Due Process Clause of the Fourteenth

23  Amendment.

24      145.   Defendants' Orders fail to provide sufficient notice of which actions will

25  potentially subject Plaintiffs to civil or the criminal penalties. It would, at best, be

26  unclear to any person of ordinary intelligence what Defendants' Orders collectively

27  prohibit and/or allow.

28

146.   In addition, Defendants' Orders purport to impose criminal liability on Plaintiffs and their employees should they fail to follow Defendants' Orders. Moreover, Defendants have, at times, threatened to impose criminal liability on Plaintiffs' patrons.

147.   The Executive Orders, and Defendants enforcement thereof, violate Plaintiffs' substantive due process rights secured by the Fourteenth Amendment to the United States Constitution.

148.   In addition, Defendant Counties have violated the Due Process Clause insomuch as it fails to provide any meaningful procedure for challenging its determination that a business is non-essential, either pre or post deprivation of Plaintiffs' constitutional right to use of their property.  Logan v. Zimmerman Brush Co., 455 U.S. 422, 432-33 (1982). Instead, Defendants simply announced that Plaintiffs' Gyms were not essential, without any formal process.

149.   Defendants' Orders expressly deprived, and continue to deprive, Plaintiffs of their rights and liberties in lawfully operating their businesses by ordering the closure of "Non-Essential" businesses without affording Plaintiffs with a constitutionally adequate hearing to present their case in favor of allowing Plaintiffs' businesses to remain open.

150.   Accordingly, Defendants failed to comply both procedural and substantive due process requirements as provided for by the Fourteenth Amendment of the United States Constitution when depriving Plaintiffs of their rights and liberties as they relate to Plaintiffs' respective properties / businesses, which would have given Plaintiffs a meaningful opportunity to respond to the Executive Orders and explain how and why the Executive Orders were unconstitutional as applied to Plaintiffs.

151.   Because Defendants' Orders are based upon a procedurally deficient and substantively unlawful process, Defendants directly and proximately damaged Plaintiffs by depriving Plaintiffs of their ability to lawfully operate their respective businesses without unconstitutional government intervention.

152.   Defendants' Orders that require Plaintiffs to abstain from conducting lawful business in the State of California, violates Plaintiffs' rights under the United States Constitution.

153.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their Constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders and Emergency Directives, namely, the financial harm Plaintiffs have suffered and continue to suffer as a result of Defendants' unlawful Orders and Emergency Directives is such that Plaintiffs may be forced to permanently close.

154.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

155.   Plaintiffs respectfully seek a declaration that the Defendant Counties' Orders violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

<u>THIRD CLAIM FOR RELIEF</u>

VIOLATION OF THE CALIFORNIA CONSTITUTION

Right to Liberty (Cal. Const. Art. 1, § 1)

(By Plaintiffs against All Defendants)

156.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth in all preceding paragraphs as if fully set forth herein.

157.   Article 1, § 1 of the California Constitution provides, in relevant part, "Article 1, Section 1: All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

158.   Defendants Orders have interfered both with Plaintiffs' rights and liberties, as set forth in Article 1, Sections 1, 7, and 19 of the California Constitution, as well as deprived Plaintiffs of the use, enjoyment, and ability to operate their respective

businesses on account of a discriminatory and arbitrary classification as "Non-Essential" businesses.

159.   Defendants' Orders have proximately and legally caused Plaintiffs' financial harm, which will continue unless and until this Court enjoins Defendants from enforcing their respective Orders.

160.   Defendants' Orders that require Plaintiffs to abstain from conducting lawful business in the State of California, violates Plaintiffs' rights under the California Constitution.

161.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their Constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders and Emergency Directives, namely, the financial harm Plaintiffs have suffered and continue to suffer as a result of Defendants' unlawful Orders and Emergency Directives is such that Plaintiffs may be forced to permanently close.

162.   Accordingly, Plaintiffs have found it necessary to engage the services of private council to vindicate their rights under law and therefore are entitled to an award of attorneys' fees pursuant to California Code of Civil Procedure § 1021.5.

<u>FOURTH CLAIM FOR RELIEF</u>

VIOLATION OF THE CALIFORNIA CONSTITUTION

Right to Liberty (Cal. Const. Art. 1, § 7)

(By Plaintiffs against All Defendants)

163.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth in all preceding paragraphs as if fully set forth herein.

164.   Article 1, Section 7 of the California Constitution provides, in pertinent part:

Article 1, Section 7:

(a) A person may not be deprived of life, liberty, or property without
    due process of law or denied equal protection of the laws; provided,

that nothing contained herein or elsewhere in this Constitution imposes upon the State of California or any public entity, board, or official any obligations or responsibilities which exceed those imposed by the Equal Protection Clause of the 14th Amendment to the United States Constitution with respect to the use of pupil school assignment or pupil transportation. In enforcing this subdivision or any other provision of this Constitution, no court of this State may impose upon the State of California or any public entity, board, or official any obligation or responsibility with respect to the use of pupil school assignment or pupil transportation, (1) except to remedy a specific violation by such party that would also constitute a violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution, and (2) unless a federal court would be permitted under federal decisional law to impose that obligation or responsibility upon such party to remedy the specific violation of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

165.    The guarantee of equal protection under the California Constitution is substantially equivalent and analyzed similarly to that provided by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. See Kenneally v. Med. Bd., 27 Cal. App. 4th 489 (App. 2 Dist. 1994).

166.    Article 1, § 1 of the California Constitution has further been judicial defined as meaning no person or class of persons shall be denied the same protections of the laws enjoyed by other persons or other classes in like circumstances in the lives, liberty, and property, and in their pursuit of happiness. See People v. Romo, 14 Cal.3d 189 (1975); Gray v. Whitmore, 17 Cal. App. 3d 1 (1971).

167.    Defendants' Orders that require Plaintiffs to abstain from conducting lawful business in the State of California, violates Plaintiffs' rights under the California Constitution.

168.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their Constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders and Emergency Directives, namely, the financial harm Plaintiffs have suffered and continue to suffer as a result of Defendants'

1   unlawful Orders and Emergency Directives is such that Plaintiffs may be forced to
2   permanently close.

3   169.    Accordingly, Plaintiffs have found it necessary to engage the services of
4   private council to vindicate their rights under law and therefore are entitled to an award
5   of attorneys' fees pursuant to California Code of Civil Procedure § 1021.5.

6   <u>FIFTH CLAIM FOR RELIEF</u>

7   VIOLATION OF CALIFORNIA GOVERNMENT CODE § 8572

8   Commandeering Private Property or Personnel

9   (By Plaintiffs against Defendant Newsom)

10   170.    Plaintiffs incorporate by reference and re-allege each and every allegation
11   set forth in all preceding paragraphs as if fully set forth herein.

12   171.    The State of California's Government Code, Title 2, Chapter 7, Article 3,
13   Section 8572, states in pertinent part:

> In the exercise of the emergency powers hereby vested in
> him during a state of war emergency or state of
> emergency, the Governor is authorized to commandeer or
> utilize any private property or personnel deemed by him
> necessary in carrying out the responsibilities hereby vested
> in him as Chief Executive of the state and the state shall
> pay the reasonable value thereof.

20   172.    On March 4, 2020, Defendant Newsom declared a "State of Emergency"
21   in response to the threat of the spread of COVID-19 throughout California's
22   communities.

23   173.    Subsequently, on or about March 19, 2020, Defendant Newsom issued
24   Executive Order N-33-20. See Exhibit 2.

25   174.    Executive Order N-33-20 states, in relevant part, that "all individuals
26   living in the State of California" "stay home or at their place of residence except as
27   needed to maintain continuity of operations of the federal critical infrastructure sectors
28   outlined at https://www.cisa.gov/identifying-criticalinfrastructure-during-covid-19."

COMPLAINT

175.    Defendant Newsom's Order further "identified 16 critical infrastructure sectors (discussed herein) whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof" such that Defendant Newsom ordered that "Californians working in these 16 critical infrastructure sectors continue their work because of the importance of these sectors to Californians' health and well-being."

176.    Defendant Newsom's Order continued, "this Order is being issued to protect the public health of Californians" and that "our goal is simple, we want to bend the curve, and disrupt the spread of the virus."

177.    Defendant Newsom then directed the Office of Emergency Services to "take all necessary steps to ensure compliance with this Order" and that the "Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665."

178.    California Government Code Section 8665 states, "Any person who violates any of the provisions of this chapter or who refuses or willfully neglects to obey any lawful order or regulation promulgated or issued as provided in this chapter, shall be guilty of a misdemeanor and, upon conviction thereof, shall be punishable by a fine not to exceed one thousand dollars ($1,000) or by imprisonment not to exceed six months or by both such fine and imprisonment."

179.    As a result of the issuance of the Governor's Order, California businesses, such as Plaintiffs, were not included in any of the sixteen (16) "critical infrastructure sectors," and therefore were "non-essential" and effectively ordered, under penalty of fine and threat of imprisonment, to cease conducting any of their lawful daily business activities.

180.    By virtue of this Executive Order, Defendant Newsom commandeered and utilized Plaintiffs' businesses for the purpose of slowing the spread of COVID-19.  To date, however, the State of California has not paid Plaintiffs the "reasonable value

thereof" in exchange for Defendant Newsom's commandeering and utilization of Plaintiffs' "non-essential" businesses.

181.    Plaintiffs have found it necessary to engage the service of counsel to vindicate their rights under California Government Code Section 8572. Plaintiffs are entitled to an award of attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A. Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that Defendants' Orders listed above violate the Due Process Clause as applied to Plaintiffs because they fail to provide fair notice of what the law requires;

B. Set aside Defendants' Orders; holding Defendants' Orders to be unlawful;

C. Permanently enjoin Defendants and all persons and entities acting in concert with Defendants, including but not limited to any law enforcement agencies, from enforcing Defendants' Orders;

D. Issue a Temporary Restraining Order and a preliminary injunction preventing Defendants from enforcing or implementing their Orders until this Court rules upon the merits of this lawsuit;

E. Permanently enjoin Defendants and all persons or entities acting in concert with Defendants, including but not limited to any law enforcement agencies, from enforcing the Orders;

F. Award damages arising out of their § 1983 Claims, and specifically under the Fifth Amendment of the U.S. Constitution and Article 1, Section 19 of the California Constitution's Taking Clause(s);

G. Award Plaintiffs the reasonable value of the loss of the respective businesses by virtue of Defendants' Orders pursuant to California Government Code Section 8572;

H. Award reasonable attorneys' fees and costs incurred in this action pursuant to 42 U.S.C. § 1988 and Cal. Gov't Code § 8572; and

I. Any other such relief as this Court may deem just and proper.

Dated:  October 26, 2020        UPLIFT LAW, P.C.

By: _____
        Melissa G. Fulgencio
        Stephanie Beale
        Attorneys for Plaintiffs

COMPLAINT